UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NANCY SAMBERG,

          Plaintiff,

    v.

WHITESTONE HOME FURNISHINGS, LLC,

          Defendant.

Case No.  25-cv-10767-JSC

**ORDER RE: DEFENDANT'S MOTION TO DISMISS**

Re: Dkt. No. 32

Plaintiff, on behalf of a putative class, sues Whitestone Home Furnishings, LLC, d/b/a Saatva, for misleadingly advertising its mattresses as "Made in the U.S.A."  (Dkt. No. 29.)[1]  Now pending before the Court is Saatva's motion to dismiss Plaintiff's amended complaint.  (Dkt. No. 32.)  Having carefully considered the parties' submissions, and with the benefit of oral argument on May 8, 2026, the Court GRANTS Saatva's motion to dismiss.  Plaintiff's California Business & Professions Code § 17533.7 claim fails because Plaintiff has not alleged Saatva included "Made in the U.S.A." or similar words on any merchandise or container.  Because Plaintiff has not plausibly alleged her purchased product's imported parts constituted more than five percent of its final wholesale value, section 17533.7(b)'s safe harbor bars her remaining statutory claims.  The Court also dismisses Plaintiff's breach of contract claim because she has not plausibly alleged Saatva's breach.

**BACKGROUND**

I.    AMENDED COMPLAINT ALLEGATIONS

Saatva "sells mattresses through its website."  (Dkt. No. 29 ¶ 1.)  In November 2023,

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

United States District Court
Northern District of California

Plaintiff "used the Saatva Website to shop for and purchase a Saatva Classic Mattress." (*Id.* ¶ 28.) At that time, "the product page for the Saatva Classic mattress stated under 'Specifications' that all mattresses were 'Made in the U.S.A.,'" and "'[e]very Saatva mattress is made to order and handcrafted in America with care and pride using only the highest quality, consciously sourced materials.'" (*Id.* ¶¶ 28-29.) "Saatva's website [also] boasted a 'Made in America' subpage which stated that Saatva 'Mattresses are Made in the U.S.A.'; that '[e]very Saatva mattress is proudly handcrafted to order right here in the U.S. using only the highest quality, consciously sourced materials'; [and] that Saatva mattresses are 'proudly American made' and '[t]he best mattresses made in the U.S.A.'" (*Id.* ¶ 30.) In addition, a few months before Plaintiff purchased her mattress, "Saatva ran television advertisements for a Fourth of July sale advertising 'hand-crafted American-made mattresses.'" (*Id.* ¶ 31.)

"Plaintiff saw, relied, on, and was deceived by Saatva's Made in USA advertising" because she "tries to support companies that sell products that are produced in the United States." (*Id.* ¶ 52.) From Saatva's statements, she understood "the mattress she purchased was not only assembled in the U.S. but was also made from domestically sourced materials." (*Id.*) "Had Plaintiff known that the mattress was made from foreign-sourced materials, she would not have purchased the mattress or would have paid less for it." (*Id.*)

When Plaintiff purchased her mattress, Saatva's "Made in America" subpage also "stated in fine print that some of its materials were sourced from outside the United States" and "'[w]e source all of our eco-friendly foams and 85% of our other materials in the U.S.A.'" (*Id.* ¶¶ 41, 43.) "The roughly 15% of 'other materials' that are sourced outside the United States constitute a sufficiently large portion of the wholesale value of Saatva's mattresses that Saatva warned customers that it may have to raise prices due to new tariffs on foreign goods." (*Id.* ¶ 43.) Furthermore, in April 2025, after President Trump "signed an executive order imposing a 10% tariff on all countries," Saatva's director of public relations Shari Ajayi stated "even though Saatva manufactures mattresses in the United States, 'certain components—such as wire, hardware, and some specialty fabrics—are sourced from international partners.'" (*Id.* ¶¶ 44, 45.) Ms. Ajayi also explained "'some components—such as latex harvested from rubber trees and fabrics used in

upholstered frames—are sourced internationally, . . . making the company vulnerable to tariff shifts." (*Id.* ¶ 46.)  And, in an April 22, 2025 website post, Saatva stated "it was 'proud to handcraft and assemble [its] mattresses in [its] American factories using *mostly* U.S.-sourced materials,' but that 'due to new tariffs on global trade, some of the globally-sourced raw materials [it] use[s] may be subject to price increases,'" which "'may soon affect the cost of some products.'" (*Id.* ¶ 47.)  Then, in an August 13, 2025 blogpost, Saatva warned "'[e]ven mattresses that are "assembled in the USA" can be impacted if they rely on imported materials like memory foam or steel coals.'" (*Id.* ¶ 48.)  And, Saatva continued, "'[i]nnerspring mattresses could see price hikes in the 10-20% range if they use imported steel for coils,'" and Saatva could be affected because "'some of the raw materials [it] use[s] may be subject to price increases.'" (*Id.*)

Between April 2025 and February 2026, Saatva increased its price for the Queen Saatva Classic 11.5-inch mattress in Luxury Firm from $2,099 to $2,179—i.e., by $80.  (*Id.* ¶ 49.) Because "[m]attress manufacturers are widely reported to have one of the highest profit margins in retail goods—with mattresses marked up more than 100% from their wholesale price to retail price," the "wholesale value of the Queen Saatva Classic 11.5 inch mattress in 'Luxury Firm' before tariffs was likely approximately $1,050." (*Id.*)  And, assuming the $80 price increase "represented Saatva's entire increased tariffs costs (despite its promise to minimize tariff effects on consumers), and an average 50% tariff on those products (far higher than the 10% tariffs announced in April 2025 or the 7.7% average effective tariff rate in place in 2025), . . . Saatva's foreign inputs cost about $160 before tariffs, or about 15% of the wholesale value of its mattresses." (*Id.*)  Even if Saatva "absorbed some of the tariff increases" or "the tariffs on Saatva's imported goods were less than 50%," "the value of foreign imports would be even more than 15% of the wholesale value of Saatva's mattresses." (*Id.*)

## II.    PROCEDURAL HISTORY

On December 17, 2025, Plaintiff sued Saatva, (Dkt. No. 1), and Saatva moved to dismiss, (Dkt. No. 23).  Plaintiff then filed an amended complaint asserting the following causes of action:

(1) California Business & Professions Code § 17533.7;

(2) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750;

(3) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500;

(4) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; and

(5) breach of contract.

(Dkt. No. 29.)  Defendant now moves to dismiss Plaintiff's amended complaint.  (Dkt. No. 32.)

**DISCUSSION**

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include a "short and plain statement of [each] claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While the Rule 8 pleading standard does not require "detailed factual allegations," "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  On a motion to dismiss, a court "must take all of the factual allegations in the complaint as true."  *Id.*  However, this presumption does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Id.*  Ultimately, to avoid dismissal, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," in other words, to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (cleaned up); *see also id.* (explaining "[t]he plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully" (citation omitted)).

In addition, Federal Rule of Civil Procedure 9(b) requires claims "grounded in fraud" or "sound[ing] in fraud" to be pled with particularity.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (cleaned up).  A claim "sound[s] in fraud" if it "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003); *see also id.* at 1103-04 (explaining "the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)").  "Rule 9(b)'s particularity requirement applies to state-law causes of action" because "the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule."  *Id.* at 1103 (cleaned up).  So, even if fraud is not a necessary element of a state law cause of action, a plaintiff who alleges a defendant's "unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of that claim," must allege that fraudulent

United States District Court
Northern District of California

4

conduct with particularity to satisfy Rule 9(b). *See Kearns*, 567 F.3d at 1125.

To determine whether a claim sounding in fraud satisfies Rule 9(b), a district court considers whether the complaint alleges "the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (cleaned up). Rule 9(b)'s particularity requirement exists in part "to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints as a pretext for the discovery of unknown wrongs." *Kearns*, 567 F.3d at 1125 (cleaned up).

Because all Plaintiff's claims are based on Saatva's allegedly misleading "Made in the U.S.A." statements, they are "grounded in fraud," and Rule 9(b) applies. *See Alaei v. Rockstar, Inc.*, 224 F. Supp. 3d 992, 999 (S.D. Cal. 2016) (applying Rule 9(b) to section 17533.7 claim); *Hood v. Handi-Foil Corp.*, No. 24-CV-02373-RS, 2024 WL 4008711, at *2 (N.D. Cal. Aug. 29, 2024) (applying Rule 9(b) to CLRA, FAL, and UCL claims based on misleading "Made in the U.S.A." claims); *see also In re CMR Mortg. Fund, LLC*, No. 08-32220 TEC, 2009 WL 2870114, at *4 (Bankr. N.D. Cal. Sept. 4, 2009) (applying Rule 9(b)'s "particularity requirement [] to a claim for breach of contract that is grounded in fraud" (citing *Vess*, 317 F.3d at 1103-06)); *Marks v. United Parks & Resorts, Inc.*, No. 24-CV-1992-MMA-KSC, 2025 WL 2767941, at *9 (S.D. Cal. Sept. 26, 2025) ("[W]hen a contract claim is predicated on the same allegedly misleading advertising as the statutory fraud claims, courts often apply Rule 9(b)." (citing cases)).

## I.    COUNT I: BUSINESS & PROFESSIONS CODE SECTION 17533.7

California Business & Professions Code § 17533.7 provides:

> It is unlawful for any person, firm, corporation, or association to sell or offer for sale in this state any merchandise *on which merchandise or on its container there appears the words* "Made in U.S.A.," "Made in America," "U.S.A.," or similar words if the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States.

Cal. Bus. & Prof. Code § 17533.7(a) (emphasis added). To interpret a California statute, courts begin with "the statutory language, giving it a plain and commonsense meaning." *Niedermeier v.*

*FCA US LLC*, 15 Cal. 5th 792, 804 (2024) (quotation marks and citation omitted). "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." *Wasatch Prop. Mgmt. v. Degrate*, 35 Cal. 4th 1111, 1121–22 (2005), *as modified* (July 27, 2005) (citations omitted). Courts "do not consider statutory language in isolation; instead, [they] examine the entire statute to construe the words in context." *Niedermeier*, 15 Cal. 5th at 804 (citation omitted). "If the language is unambiguous, then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." *Id.* (quotation marks and citation omitted). But "if the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." *Id.* (cleaned up).

Because Plaintiff only alleges Saatva's statements on its website and in television advertisements, Plaintiff has not plausibly alleged any "Made in U.S.A." or similar statement "on [] merchandise or on its container." First, drawing reasonable inferences from the Amended Complaint in Plaintiff's favor, "merchandise" does not encompass anything more than the purchased mattress. *See* Merchandise, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/merchandise (last visited Apr. 27, 2026) (defining merchandise as "the commodities or goods that are bought and sold in business"). The website and television advertisements are not "merchandise" within the statute's meaning as a matter of law.

Second, as for the statute's application to the merchandise's "container," Merriam-Webster defines a container as "one that contains: such as (a) a receptable (such as a box or jar) for holding goods, [or] (b) a portable compartment in which freight is placed (as on a train or ship) for convenience of movement." *See* Container, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/container (last visited Apr. 27, 2026); *see also New York v. Belton*, 453 U.S. 454, 461 n.4 (1981) ("'Container' here denotes any object capable of holding another object."). So, in the context of section 17533.7, the merchandise's container plainly refers to the "delivery systems" or "packaging" which "hold[s] the merchandise." *See Baum v. J-B Weld Co., LLC*, No. 19-CV-01718-EMC, 2020 WL 7396539, at *6-9 (N.D. Cal. Aug. 4, 2020), *modified on reconsideration*, 2020 WL 4923624 (N.D. Cal. Aug. 21, 2020) (cleaned up) (discussing difficulty

of distinguishing "container" from "merchandise" itself).  Because the plain meaning of "container" does not encompass websites selling or advertising merchandise or television advertisements, section 17533.7 does not apply to Saatva's alleged statements.  *See Oxina v. Lands' End, Inc.*, No. 14-CV-2577-MMA NLS, 2015 WL 4272058, at *8 (S.D. Cal. June 19, 2015) ("It is clear and unambiguous that the text of § 17533.7 only creates liability where the words 'Made in U.S.A.,' . . . appear on the merchandise, or on the merchandise's container [and] does not create liability for a product that is misleadingly described on a website with the words 'Made in U.S.A.'").

Plaintiff's attempt to describe Saatva's statements as "the online equivalent of a label," (Dkt. No. 33 at 7), is irrelevant as a label is not synonymous with a container.  *See* Label, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/label (last visited Apr. 24, 2026) ("[A] slip . . . inscribed and affixed to something for identification or description."). And Plaintiff's lament that applying the plain meaning of "container" "would all but eliminate the effectiveness of Section 17533.7 in the digital economy, where customers like Plaintiff rarely, if ever, see a physical product or its container before purchase" is unavailing.  (Dkt. No. 33 at 7.) Section 17533.7 is just one of the "Particular Offenses" listed in the provisions of California's Business & Professions Code governing false advertising.  *See Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1268 (2007), *as modified on denial of reh'g* (July 26, 2007) ("Section 17533.7 appears in the chapter of the Business and Professions Code covering false advertising."). California Business & Professions Code § 17500, the False Advertising Law, proscribes false statements made online.  *See* Cal. Bus. & Prof. Code § 17500 (prohibiting false statements "in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet").  So, even if section 17533.7 does not govern Saatva's conduct, the False Advertising Law may.

Plaintiff's reliance on *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663 (2006), *as modified on denial of reh'g* (Jan. 31, 2006), is also not persuasive.  Although Plaintiff emphasizes the *Colgan* court noted the defendant "represent[ed] on its tools, ***website, and advertising*** that the tools were 'Made in U.S.A.,'" the defendant still "represented on the tool

7

United States District Court
Northern District of California

products [and] on packaging . . . that the tools were made in the United States. *Id.* at 673, 702 (emphasis added). So, unlike Plaintiff, the defendant in *Colgan* represented its tools were made in the United States on both its tools (the "merchandise") and their packaging (its "container"). No similar allegations are made here.

Because Plaintiff does not allege facts that plausibly support an inference "Made in U.S.A." or similar words appeared on the purchased "merchandise or on its container," Plaintiff fails to state a claim Saatva violated California Business & Professions Code § 17533.7. However, because at oral argument Plaintiff stated there is a "Made in U.S.A." label attached to her mattress, the Court grants Plaintiff leave to amend her section 17533.7 claim.

## II.    COUNTS II, III, AND IV: CLRA, FAL, AND UCL

"In California, unfair competition claims are subject to the safe harbor doctrine, which precludes plaintiffs from bringing claims based on 'actions the Legislature permits.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 184 (1999)). So, if "another provision" of California law "clearly permit[s] the conduct," "courts may not use the unfair competition law to condemn [such] actions." *See Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 183-84; *see also id.* at 182 ("If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination.").

Because "[t]he UCL, CLRA, and FAL . . . all prohibit unlawful, unfair, or fraudulent business practices," deceptive labeling claims under the UCL, CLRA, and FAL are all subject to California's safe harbor doctrine. *See Ebner*, 838 F.3d at 963. Courts have "consistently applied the safe harbor doctrine to" UCL, CLRA, FAL claims when "the alleged violations are predicated on conduct that is lawful under Section 17533.7." *Flodin v. Cent. Garden & Pet Co.*, No. 21-CV-01631-JST, 2023 WL 3607278, at *2 (N.D. Cal. Mar. 9, 2023) (UCL, CLRA, and FAL); *see, e.g.*, *Hood*, 2024 WL 4008711, at *2-3 (UCL, CLRA, and FAL); *Alaei*, 224 F. Supp. 3d at 1000-01 (same); *Hass v. Citizens of Human., LLC*, No. 14-CV-1404 JLS (WVG), 2016 WL 7097870, at *4-5 (S.D. Cal. Dec. 6, 2016) (same); *Baum*, 2020 WL 4923624, at *3-4 (same).

### A.    Section 17533.7(b) Safe Harbor

Section 17533.7 includes a safe harbor provision, specifically:

> This section shall not apply to merchandise made, manufactured, or produced in the United States that has one or more articles, units, or parts from outside of the United States, if all of the articles, units, or parts of the merchandise obtained from outside the United States constitute not more than 5 percent of the final wholesale value of the manufactured product.

Cal. Bus. & Prof. Code § 17533.7(b).  By adding this safe harbor, the California Legislature "shifted from a strict prohibition on domestic origin labeling to one that exempts sellers for selling products that were made in the United States but contain up to a certain percentage of foreign sourced components." *See Fitzpatrick v. Tyson Foods, Inc.*, No. 2:16-CV-00058-JAM (EFB), 2016 WL 5395955, at *1-2 (E.D. Cal. Sept. 27, 2016), *aff'd*, 714 F. App'x 797 (9th Cir. 2018).

### B.    Plaintiff Bears the Burden of Pleading the Safe Harbor Does Not Apply

"Where a plaintiff fails to plausibly allege that [the] percentage-based safe harbor threshold of Section 17533.7 was exceeded in a product that was otherwise labeled as 'Made in the U.S.A.,' such claims cannot succeed." *McCoy v. McCormick & Co., Inc.*, No. 1:25-CV-00231-JLT-SAB, 2025 WL 1918546, at *10 (E.D. Cal. July 11, 2025), *report and recommendation adopted*, 2025 WL 2315457 (E.D. Cal. Aug. 12, 2025); *see also Corona v. It's a New 10, LLC*, No. 25-CV-377-GPC (BLM), 2025 WL 2173961, at *9 (S.D. Cal. July 31, 2025) (rejecting the plaintiff's argument the safe harbor is an affirmative defense); *Hood*, 2024 WL 4008711, at *3 (same).

Although a plaintiff need not plead with "mathematical precision," she must "set forth some set of facts" from which the Court can draw a reasonable inference the defendant's merchandise "stray[s] afoul of the 5% safe harbor limit." *See Daldalian v. Pepsico, Inc.*, No. 2:25-CV-01491-WLH-E, 2025 WL 2778326, at *4 (C.D. Cal. Sept. 3, 2025); *see, e.g.*, *Flodin v. Cent. Garden & Pet Co.*, No. 21-CV-01631-JST, 2023 WL 4686016, at *2 (N.D. Cal. July 21, 2023) (dismissing claim because "[w]hile it is possible that avocado represents 'more than 5 percent of the final wholesale value of the manufactured product,'. . . the factual allegations in the [complaint] do not cross the line into plausibility" (citations omitted)).

9

United States District Court
Northern District of California

### C.    Plaintiff Does Not Plausibly Allege Her Mattress Falls Outside the Safe Harbor

Because section 17533.7(b)'s safe harbor exempts specific "***merchandise*** . . . if all of the articles, units, or parts ***of the merchandise*** obtained from outside the United States constitute not more than 5 percent of the final wholesale value of the manufactured product," Cal. Bus. & Prof. Code § 17533.7(b) (emphasis added), Plaintiff must allege facts regarding foreign components of the specific merchandise at issue. *See also McCoy*, 2025 WL 1918546, at *10 (dismissing the plaintiff's complaint for "fail[ing] to make *any* allegations related to the composition of each Product"). Plaintiff's Amended Complaint does not do so.

Plaintiff purchased her mattress in November 2023 when Saatva's advertising represented all of its mattresses are "Made in the U.S.A." (Dkt. No. 29 ¶ 28.) The Amended Complaint, however, says almost nothing about the composition of Plaintiff's mattress. Plaintiff only alleges when "Plaintiff purchased her mattress, Saatva stated in fine print that some of its materials were sourced from outside the United States" and "'[w]e source all of our eco-friendly foams and over 85% of our other materials in the U.S.A.'" (*Id.* ¶¶ 41, 43.) But these allegations do not plausibly support any reasonable inference "more than 5 percent of the final wholesale value of" Plaintiff's mattress was derived from parts obtained outside the United States.

Plaintiff's allegations regarding the impact of tariffs imposed in 2025 do not support any inference as to the value of parts in Plaintiff's 2023 mattress. Plaintiff alleges the price of Saatva's Queen Classic 11.5-inch Luxury Firm mattress increased by $80 (slightly less than 4%) between April 2025 and February 2026. (Dkt. No. 29 ¶ 49.) Relying on assumptions regarding tariff rates imposed beginning in April 2025, how much Saatva passed along tariff costs to consumers, and how much Saatva marks up mattresses from their wholesale price, Plaintiff estimates imported inputs comprised about 15% of this 2025 mattress's wholesale value, which would exceed section 17533.7(b)'s safe harbor. (*Id.*) But, so what? The issue here is whether ***Plaintiff's*** mattress, purchased in November 2023, contained parts from outside the United States constituting more than five percent of Plaintiff's mattress's wholesale value. These allegations have no bearing on that question. For similar reasons, Plaintiff's allegations regarding other statements Saatva made in 2025 fail to support a plausible inference Plaintiff's mattress exceeded the safe harbor.

In her opposition brief and at oral argument, Plaintiff contended *Corona v. It's a New 10, LLC*, No. 25-CV-377-GPC (BLM), 2025 WL 3536117 (S.D. Cal. Dec. 9, 2025), is analogous because the court there "declined to dismiss an amended complaint in which the plaintiff alleged that foreign ingredients were emphasized by the manufacturer." (Dkt. No. 33 at 16.)  But in *Corona*, the plaintiff still alleged the purchased product specifically contained foreign palm oil, hydrolyzed silk, panthenol, and White Mulberry leaf extract. *Id.* at \*2.  And the court considered the plaintiff's allegations sufficient not only because of the manufacturer's emphasis on those ingredients, but also because of allegations the product ingredient list included those parts as the eleventh, thirteenth, fourteenth, and fifteenth of nineteen total ingredients and each product was either not produced in or unlikely to be sourced from the United States. *Id.* at \*6.  Plaintiff, in contrast, does not even identify which components of her mattress were sourced outside the United States.

Because Plaintiff does not plausibly allege any article, unit, or part of her mattress was obtained from outside the United States, let alone that the value of those articles, units, or parts exceeds five percent of the wholesale value of the mattress she purchased, she fails to plausibly allege it falls outside section 17533.7(b)'s safe harbor.  Furthermore, absent such allegations, Plaintiff cannot allege how Saatva's "Made in the U.S.A." statements were misleading, and her complaint does not satisfy Federal Rule of Civil Procedure 9(b). *See Kearns*, 567 F.3d at 1124 ("Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct." (cleaned up)).

So, because Plaintiff does not plausibly allege any "article[], unit[], or part[]" of her mattress was "obtained from outside the United States," let alone that those unidentified articles, units or parts constitute more than 5% of the wholesale value of the mattress she purchased, she does not plausibly allege the mattress she purchased falls outside of section 17533.7's safe harbor. The Court therefore grants Saatva's motion to dismiss Plaintiff's CLRA, FAL, and UCL claims.

## III.    COUNT IV: BREACH OF CONTRACT

California law is unsettled as to whether the safe harbor doctrine also bars common law or breach of contract claims. *Compare Hood*, 2024 WL 4008711, at \*1, 3 (dismissing all claims,

including "claims for breach of express and implied warranties and unjust enrichment" as barred by section 17533.7), *with Daldalian*, 2025 WL 2778326, at \*4-6 (finding the safe harbor barred the plaintiff's UCL, CLRA, and FAL claims but addressing common law fraud, breach of express warranty, and unjust enrichment claims separately). So, the Court denies Saatva's motion to dismiss Plaintiff's breach of contract claim as barred by section 17533.7's safe harbor, and instead analyzes Saatva's other arguments for dismissal.

Under California law, a breach of contract claim requires "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). In her breach of contract claim, Plaintiff alleges "contracts [] memorialized in order confirmations that were sent to purchasers" "required that [Saatva] provide Plaintiff . . . with mattresses that were Made in the USA consistent with . . . [Saatva's] representations on the Website." (Dkt. No. 29 ¶¶ 107, 109.) At the time of Plaintiff's purchase, Saatva's website represented, for example, "some of its materials were sourced from outside the United States," and "[w]e source all of our eco-friendly foams and over 85% of our other materials other materials in the U.S.A." (*Id.* ¶¶ 41, 43.) Plaintiff alleges Saatva breached its contract with Plaintiff by "failing to provide mattresses that were Made in the USA as claimed on the Website" and "instead charg[ing] Plaintiff . . . for mattresses that were substantially made from foreign-sourced materials." (*Id.* ¶ 112.)

Plaintiff does not plausibly allege Saatva breached the alleged contract. Plaintiff's allegation Saatva breached its contractual obligation to "provide Plaintiff . . . with mattresses that were Made in the USA consistent with . . . [its] representations on the Website" by "failing to provide mattresses that were Made in the USA as claimed on the Website," is conclusory. And Plaintiff does not allege any facts supporting her conclusory allegation. She does not allege any facts about the mattress she received, much less facts which would support a reasonable inference Saatva provided Plaintiff with a mattress not "Made in the USA as claimed on the Website" or "substantially made from foreign-sourced materials." (*Id.*) That Saatva made statements about certain foreign components in its products in 2025 is unavailing, including because Plaintiff does

United States District Court
Northern District of California

not plausibly allege those statements apply to the mattress she purchased more than a year and a half earlier.

Because Plaintiff has not plausibly alleged Saatva breached the alleged contract, the Court dismisses Plaintiff's breach of contract claim.

## CONCLUSION

For the reasons stated above, the Court GRANTS Saatva's motion to dismiss Plaintiff's amended complaint.  However, because Plaintiff may plausibly allege a statement on her merchandise or container, her mattress exceeded the safe harbor percentage threshold, or Saatva breached a contract with her, the Court grants Plaintiff leave to amend her complaint.  *See Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017) ("[A] district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." (quotation marks and citation omitted)).  Plaintiff's deadline to file an amended complaint is June 12, 2026.  Plaintiff may not add new claims or defendants without the Court's leave.

This Order disposes of Docket No. 32.

**IT IS SO ORDERED.**

Dated: May 11, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

13