United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCY SAMBERG,<br>Plaintiff,<br>v.<br>WHITESTONE HOME FURNISHINGS, LLC,<br>Defendant. | Case No. 3:25-cv-10767-JSC<br>**ORDER RE: MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br>Re: Dkt. No. 53 |

Plaintiff, on behalf of a putative class, sues Whitestone Home Furnishings, LLC, d/b/a Saatva, for misleadingly advertising its mattresses as "Made in the U.S.A." (Dkt. No. 47.)[1] Pending before the Court is Defendant's motion to dismiss the second amended complaint ("SAC"). (Dkt. No. 53.) Having carefully considered the parties' submissions, and with the benefit of oral argument on October 8, 2026, the Court GRANTS Saatva's motion to dismiss. Plaintiff's California Business & Professions Code § 17533.7 claim fails because Plaintiff does not allege she relied on the product's labeling to her detriment. Because Plaintiff does not plausibly allege her purchased product's imported parts constituted more than five percent of its final wholesale value, the safe harbor of section 17533.7(b) bars her remaining statutory claims and her breach of contract claim.

## BACKGROUND

### I. SECOND AMENDED COMPLAINT ALLEGATIONS

Saatva "sells mattresses through its website." (Dkt. No. 47 ¶ 1.) In November 2023, Plaintiff "used the Saatva Website to shop for and purchase a Saatva Classic Mattress." (*Id.* ¶ 29.)

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generate page numbers at the top of the documents.

United States District Court
Northern District of California

The Saatva Classic mattress "contains five (5) layers of materials" and is "constructed using 'tempered recycled steel coils, eco-conscious foams, and organic cotton.'" (*Id.* ¶¶ 55, 62.)

At that time, "the product page for the Saatva Classic mattress stated under 'Specifications' that all mattresses were 'Made in the U.S.A.,'" and "'[e]very Saatva mattress is made to order and handcrafted in America with care and pride using only the highest quality, consciously sourced materials.'" (*Id.* ¶¶ 29-30.) "Saatva's website [also] boasted a 'Made in America' subpage which stated that Saatva 'Mattresses are Made in the U.S.A.'; that '[e]very Saatva mattress is proudly handcrafted to order right here in the U.S. using only the highest quality, consciously sourced materials'; [and] that Saatva mattresses are 'proudly American made' and '[t]he best mattresses made in the U.S.A.'" (*Id.* ¶ 31 (second and fourth alterations in original).) In addition, a few months before Plaintiff purchased her mattress, "Saatva ran television advertisements for a Fourth of July sale advertising 'hand-crafted American-made mattresses.'" (*Id.* ¶ 32.) And, within a few days of Plaintiff's purchase, "Saatva and its flagship manufacturing partner, Bedding Industries of America, jointly issued a press release stating that '[a]ll of Saatva's handcrafted, eco-friendly mattresses are made to order in the USA . . . .'" (*Id.* ¶ 33.) "Saatva also placed a physical label on its mattress that reads 'Made in America' and prominently displays an American flag." (*Id.* ¶ 34.)

"Plaintiff saw, relied on, and was deceived by Saatva's Made in USA advertising" because she "tries to support companies that sell products that are produced in the United States." (*Id.* ¶ 72.) From Saatva's statements, she understood "the mattress she purchased was not only assembled in the U.S. but was also made from domestically sourced materials." (*Id.*) "Had Plaintiff known that the mattress was made from foreign-sourced materials, she would not have purchased the mattress or would have paid less for it." (*Id.*)

When Plaintiff purchased her mattress, Saatva's "Made in America" subpage also "stated in fine print that some of its materials were sourced from outside the United States" and "'[w]e source all of our eco-friendly foams and 85% of our other materials in the U.S.A.'" (*Id.* ¶¶ 45, 47.) "The roughly 15% of 'other materials' that are sourced outside the United States constitute a sufficiently large portion of the wholesale value of Saatva's mattresses that Saatva warned customers that it may have to raise prices due to new tariffs on foreign goods." (*Id.* ¶ 47.) The

category of "other materials" "include[s], at minimum, the steel used in the coil units, the active spinal wire, the fabric used in the cover and the foam-encasement panels, the cotton in the cover, the thistle-pulp flame barriers, the fibers quilted into the Euro pillow top, and miscellaneous hardware and wire components." (*Id.* ¶ 64.) "Because the Saatva Class mattress contains very little foam, with foam comprising well less than half of the mattress, more than 5% of the mattress is comprised of foreign components." (*Id.* ¶ 67.) "On information and belief, the steel coil unit represents at least 20% of the wholesale value of the Saatva Classic" and overall "foreign inputs are more than 10% of the wholesale value of the Defendant's mattress." (*Id.* ¶¶ 68, 70.)

Furthermore, in April 2025, after President Trump "signed an executive order imposing a 10% tariff on all countries," Saatva's director of public relations Shari Ajayi stated "even though Saatva manufactures mattresses in the United States, 'certain components—such as wire, hardware, and some specialty fabrics—are sourced from international partners . . . .'" (*Id.* ¶¶ 48, 49.) Ms. Ajayi also explained "'some components—such as latex harvested from rubber trees and fabrics used in upholstered frames—are sourced internationally, . . . making the company vulnerable to tariff shifts." (*Id.* ¶ 50.) And, in an April 22, 2025 website post, Saatva stated "it was 'proud to handcraft and assemble [its] mattresses in [its] American factories using *mostly* U.S.-sourced materials,' but that 'due to new tariffs on global trade, some of the globally-sourced raw materials [it] use[s] may be subject to price increases,'" which "'may soon affect the cost of some products.'" (*Id.* ¶ 51.) Then, in an August 13, 2025 blogpost, Saatva warned "'[e]ven mattresses that are "assembled in the USA" can be impacted if they rely on imported materials like memory foam or steel coals.'" (*Id.* ¶ 52.) And, Saatva continued, "'[i]nnerspring mattresses could see price hikes in the 10-20% range if they use imported steel for coils,'" and Saatva could be affected because "'some of the raw materials [it] use[s] may be subject to price increases.'" (*Id.*)

Between April 2025 and February 2026, Saatva increased its price for the Queen Saatva Classic 11.5-inch mattress in Luxury Firm from $2,099 to $2,179—i.e., by $80. (*Id.* ¶ 53.) Because "[m]attress manufacturers are widely reported to have one of the highest profit margins in retail goods—with mattresses marked up more than 100% from their wholesale price to retail price," the "wholesale value of the Queen Saatva Classic 11.5 inch mattress in 'Luxury Firm'

United States District Court
Northern District of California

before tariffs was likely approximately $1,050." (*Id.*) And, assuming the $80 price increase "represented Saatva's entire increased tariffs costs (despite its promise to minimize tariff effects on consumers), and an average 50% tariff on those products (far higher than the 10% tariffs announced in April 2025 or the 7.7% average effective tariff rate in place in 2025), . . . Saatva's foreign inputs cost about $160 before tariffs, or about 15% of the wholesale value of its mattresses." (*Id.*) If "Saatva absorbed some of the tariff increases" or "the tariffs on Saatva's imported goods were less than 50%," "the value of foreign imports would be even more than 15% of the wholesale value of Saatva's mattresses." (*Id.*)

## II. PROCEDURAL HISTORY

Plaintiff sued Saatva, (Dkt. No. 1), Saatva moved to dismiss, (Dkt. No. 23), and before the Court had ruled on the pending motion, Plaintiff filed a first amended complaint. (Dkt. No. 29.) Saatva again moved to dismiss. (Dkt. No. 32.) The Court dismissed Plaintiff's amended complaint. (Dkt. No. 42.) Plaintiff then filed a second amended complaint asserting the following causes of action:

(1) California Business & Professions Code § 17533.7;

(2) California's Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750;

(3) California's False Advertising Law ("FAL"), CAL. BUS. & PROF. CODE § 17500;

(4) California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200; and

(5) breach of contract.

(Dkt. No. 29.) Defendant now moves to dismiss Plaintiff's second amended complaint. (Dkt. No. 53.)

## DISCUSSION

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include a "short and plain statement of [each] claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). While the Rule 8 pleading standard does not require "detailed factual allegations," "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). On a motion to dismiss, a court "must take all of the factual allegations in the complaint as true." *Id.* However, this presumption does not apply to

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Ultimately, to avoid dismissal, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," in other words, to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (cleaned up); *see also id.* (explaining "[t]he plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully" (citation omitted)).

In addition, Federal Rule of Civil Procedure 9(b) requires claims "grounded in fraud" or "sound[ing] in fraud" to be pled with particularity. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (cleaned up). A claim "sound[s] in fraud" if it "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003); *see also id.* at 1103-04 (explaining "the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)"). "Rule 9(b)'s particularity requirement applies to state-law causes of action" because "the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule." *Id.* at 1103 (cleaned up). So, even if fraud is not a necessary element of a state law cause of action, a plaintiff who alleges a defendant's "unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of that claim," must allege that fraudulent conduct with particularity to satisfy Rule 9(b). *See Kearns*, 567 F.3d at 1125.

To determine whether a claim sounding in fraud satisfies Rule 9(b), a district court considers whether the complaint alleges "the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (cleaned up). Rule 9(b)'s particularity requirement exists in part "to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints as a pretext for the discovery of unknown wrongs." *Kearns*, 567 F.3d at 1125 (cleaned up).

As the Court previously concluded, because all Plaintiff's claims are based on Saatva's allegedly misleading "Made in the U.S.A." statements, they are "grounded in fraud," and Rule

9(b) applies. (*See* Dkt. No. 42 at 5.)

## I. COUNT I: BUSINESS & PROFESSIONS CODE SECTION 17533.7

California Business & Professions Code § 17533.7 provides:

> It is unlawful for any person, firm, corporation, or association to sell or offer for sale in this state any merchandise ***on which merchandise or on its container there appears the words*** "Made in U.S.A.," "Made in America," "U.S.A.," or similar words if the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States.

CAL. BUS. & PROF. CODE § 17533.7(a) (emphasis added). The Court previously dismissed Plaintiff's section 17533.7 claim "[b]ecause Plaintiff does not allege facts that plausibly support an inference 'Made in U.S.A.' or similar words appeared on the purchased 'merchandise or on its container.'" (Dkt. No. 42 at 8.) In its second amended complaint, Plaintiff now alleges Defendant "placed a physical label on its mattress that reads 'Made in America' and prominently displays an American flag" and attached a photo of the label appearing on Plaintiff's mattress. (Dkt. No. 47 ¶ 34.)

Defendant moves to dismiss on the grounds "Plaintiff lacks [state statutory] standing to bring any claim under this statute because she did not rely on her mattress label in making her purchase and the label did not cause her purchase or alleged injury." (Dkt. No. 53 at 12.) To have a cause of action for a violation of section 17533.7, a party must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (citing CAL. BUS. & PROF. CODE § 17535); *see also Swearingen v. Late July Snacks LLC*, No. 13-cv-04324-EMC, 2017 WL 4641896, at *2 (N.D. Cal. Oct. 16, 2017) ("Standing under the UCL requires proof of reliance even if reliance is not an express substantive element of the underlying statute when the claim essentially sounds in misrepresentation."). While the challenged misrepresentations do not need to be "the sole or even the decisive cause of the injury-producing conduct," the plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements." *Kwikset*, 51 Cal. 4th at 326. Reliance can be based on

plaintiff being "motivated to act or refrain from action based on the truth or falsity of a defendant's statement." *Id.* at 326 n.10.

Plaintiff's second amended complaint contains no allegations that plausibly support an inference she relied on the physical mattress label to her detriment. To the contrary, she alleges only that she "saw, relied on, and was deceived by Saatva's Made in USA *advertising*." (Dkt. No. 47 ¶ 72 (emphasis added).)

Instead, in her motion to dismiss opposition, Plaintiff avers for the first time "[i]f she had seen an accurate label, she would have returned her mattress or asked Saatva for a discount to reflect the fact that the mattress was not 'Made in America.'" (Dkt. No. 55 at 13.) Even if properly alleged in the complaint, this allegation is implausible. Under federal regulations, as Defendant highlights, a mattress set "produced in the United States" needs to have the "name" and "the complete physical address of the manufacturer," 16 C.F.R. § 1633.12(a)(1)-(2), and "manufacturer" "means an individual plant or factory at which mattress sets are manufactured *or assembled*." 16 C.F.R. § 1633.2(k) (emphasis added). Here, based on Plaintiff's allegations, the relevant manufacturer would have been Bedding Industries of America. (Dkt. No. 47 ¶ 33.) Therefore, assuming an "accurate label" would have omitted the "Made in America" label, it still would have included the name and address of Bedding Industries of America but no information about the sourcing of its materials. There would have been nothing on the mattress to put Plaintiff on notice "that the mattress was not 'Made in America'" and trigger the alleged hypothetical desire to return the mattress. (Dkt. No. 55 at 13.) In sum, Plaintiff cannot have relied on the physical mattress label since, regardless of the alleged misrepresentation, the physical label could not have been a "but for" cause of any economic injury. *See Kwikset*, 51 Cal. 4th at 330. And her argument she plausibly alleges reliance because the label statement is "substantively identical" to the advertisement statements, (Dkt. No. 55 at 13), does not make sense.

So, Plaintiff has failed to sufficiently allege that she has a statutory cause of action under section 17533.7 and the Court GRANTS Saatva's motion to dismiss.

## II. COUNTS II, III, AND IV: CLRA, FAL, AND UCL

"In California, unfair competition claims are subject to the safe harbor doctrine, which

precludes plaintiffs from bringing claims based on 'actions the Legislature permits.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 184 (1999)). So, if "another provision" of California law "clearly permit[s] the conduct," "courts may not use the unfair competition law to condemn [such] actions." *Cel-Tech*, 20 Cal. 4th at 183-84; *see also id.* at 182 ("If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination.").

Because "[t]he UCL, CLRA, and FAL . . . all prohibit unlawful, unfair, or fraudulent business practices," deceptive labeling claims under the UCL, CLRA, and FAL are all subject to California's safe harbor doctrine. *See Ebner*, 838 F.3d at 963. Courts have "consistently applied the safe harbor doctrine to" UCL, CLRA, FAL claims when "the alleged violations are predicated on conduct that is lawful under Section 17533.7." *Flodin v. Cent. Garden & Pet Co.*, No. 21-CV-01631-JST, 2023 WL 3607278, at *2 (N.D. Cal. Mar. 9, 2023) (UCL, CLRA, and FAL); *see, e.g.*, *Hood v. Handi-Foil Corp.*, No. 24-cv-02373-RS, 2024 WL 4008711, at *2-3 (N.D. Cal. Aug. 29, 2024) (UCL, CLRA, and FAL); *Alaei v. Rockstar, Inc.*, 224 F.Supp. 3d 992, 1000-01 (S.D. Cal. 2016) (same); *Hass v. Citizens of Human., LLC*, No. 14-CV-1404 JLS (WVG), 2016 WL 7097870, at *4-5 (S.D. Cal. Dec. 6, 2016) (same); *Baum v. J-B Weld Co., LLC*, No. 19-cv-01718-EMC, 2020 WL 4923624, at *3-4 (N.D. Cal. Aug. 21, 2020) (same).

### A. Section 17533.7(b) Safe Harbor

Section 17533.7 includes a safe harbor provision, specifically:

> This section shall not apply to merchandise made, manufactured, or produced in the United States that has one or more articles, units, or parts from outside of the United States, if all of the articles, units, or parts of the merchandise obtained from outside the United States constitute not more than 5 percent of the final wholesale value of the manufactured product.

CAL. BUS. & PROF. CODE § 17533.7(b). By adding this safe harbor, the California Legislature "shifted from a strict prohibition on domestic origin labeling to one that exempts sellers for selling products that were made in the United States but contain up to a certain percentage of foreign sourced components." *See Fitzpatrick v. Tyson Foods, Inc.*, No. 2:16-CV-00058-JAM (EFB),

2016 WL 5395955, at *1-2 (E.D. Cal. Sept. 27, 2016), *aff'd*, 714 F. App'x 797 (9th Cir. 2018).

**B. Safe Harbor Extends to Plaintiff's Counts II, III, and IV**

As a threshold matter, Plaintiff argues because the Court "has already dismissed the Section 17533.7 claims for reasons unrelated to the Safe Harbor," the Court should not "apply[] the Safe Harbor provision to dismiss UCL, CLRA, or FAL claims." (Dkt. No. 55 at 15.) Plaintiff reasons that "if section 17533.7 does not make 'Made in the U.S.A.' representations *unlawful*, then it also cannot render such representations *lawful*" such that "the statute simply says nothing about their legality" and does not provide the clear legislative permission of an activity needed to dismiss unfair competition claims under a safe harbor provision. (*Id.* at 14.)

Plaintiff takes too narrow a view of the safe harbor provision's protections. Under section 17533.7, the California legislature has legalized the sale of merchandise marked with "Made in America" so long as the foreign inputs are sufficiently minimal. *See Baum*, 2020 WL 4923624, at *3 ("[T]he California legislature did not intend a claim of false 'Made in USA' representations to lie where the 5% safe harbor is not exceeded.") Here, as alleged, Defendant offered for sale merchandise on which "Made in America" appeared. (Dkt. No. 47 ¶ 34.) Under Plaintiff's reading, the safe harbor provision affirmatively permits Defendant to label merchandise "Made in America" so long as less than five percent of the wholesale value is foreign, but "says nothing" about the accompanying advertisements. Thus, if a company advertised a product as "Made in America," it could face lawsuits under state unfair competition laws even when state law expressly permits placing a "Made in America" label on the very same product.

That cannot be correct. "If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." *Cel-Tech*, 20 Cal. 4th at 182; *see also Loeffler v. Target Corp.*, 58 Cal. 4th 1081, 1125 (2014) ("[T]he reach of the UCL is broad, but it is not without limit and may not be used to invade 'safe harbors' provided by other statutes."). Accordingly, courts have protected defendants from unfair competition claims when the underlying representations were legal under a safe harbor provision. *See, e.g.*, *Bourgi v. West Covina Motors, Inc.*, 166 Cal. App. 4th 1649,

1661 (2008) (concluding the "statutory purpose" of a damage disclosure law "would be undermined if repairs that qualify for the safe harbor also triggered the CLRA to punish the dealer who represents the car as new"); *Barber v. Nestlé USA, Inc.*, 154 F.Supp. 3d 954, 961 (C.D. Cal. 2015) (concluding there was safe harbor from UCL, CLRA, and FAL claims because "the California Legislature considered the situation of regulating disclosure by companies with possible forced labor in their supply lines and determined that only the limited disclosure mandated by § 1714.43 is required"); *Pom Wonderful LLC v. Coca Cola Co.*, No. CV 08–06237 SJO (FMOx), 2013 WL 543361, at *5 (C.D. Cal. Feb. 13, 2013) (dismissing UCL and FAL claims when the allegedly misleading juice label complied with federal regulations).

Here, when "[t]he California Legislature amended § 17533.7 to prohibit domestic origin labels in some circumstances and not in others, [it] evidently conclude[ed] that no action should lie in the latter situation." *Fitzpatrick*, 2016 WL 5395955, at *5. Accordingly, to find Defendant's sale of "Made in America" labeled merchandise protected under section 17533.7(b), but its descriptive advertisements unprotected, would disrupt the legislatively established balance of the safe harbor provision. *See Fitzpatrick*, 2016 WL 5395955, at *5 (reaching similar conclusion); *Alaei*, 224 F.Supp. 3d at 1001 ("However, by amending section 17533.7, the legislature allowed parties to claim that their products are created in the United States when a small amount of the product was made in a foreign country. Therefore, the safe harbor doctrine similarly applies to and bars Plaintiff's CLRA claim."). So, the safe harbor provision applies to Plaintiff's CLRA, FAL, and UCL claims.

### C. Plaintiff Bears the Burden of Pleading the Safe Harbor Was Exceeded

"Where a plaintiff fails to plausibly allege that [the] percentage-based safe harbor threshold of Section 17533.7 was exceeded in a product that was otherwise labeled as 'Made in the U.S.A.,' such claims cannot succeed." *McCoy v. McCormick & Co., Inc.*, No. 1:25-CV-00231-JLT-SAB, 2025 WL 1918546, at *10 (E.D. Cal. July 11, 2025), *report and recommendation adopted*, 2025 WL 2315457 (E.D. Cal. Aug. 12, 2025). "Because 'the safe harbor doctrine . . . precludes plaintiffs from bringing claims based on "actions the Legislature permits [],"' caselaw supports that the "[p]laintiff must allege that its products fall outside the safe harbor provisions on a Rule

12(b)(6) motion," instead of placing the burden on the defendant as an affirmative defense. *Corona v. It's a New 10, LLC*, No. 25-CV-377-GPC (BLM), 2025 WL 2173961, at *9 (S.D. Cal. July 31, 2025) (quoting *Ebner*, 818 F.3d at 963); *see also Hood*, 2024 WL 4008711, at *3 (concluding same). Reflecting that burden on the plaintiff, the California Supreme Court has concluded a plaintiff cannot "plead around an absolute bar to relief [like safe harbor] simply by recasting the cause of action as one for unfair competition." *Cel-Tech*, 20 Cal. 4th at 182 (cleaned up).

Although a plaintiff need not plead with "mathematical precision," she must "set forth some set of facts" from which the Court can draw a reasonable inference the defendant's merchandise "stray[s] afoul of the 5% safe harbor limit." *See Daldalian v. Pepsico, Inc.*, No. 2:25-CV-01491-WLH-E, 2025 WL 2778326, at *4 (C.D. Cal. Sept. 3, 2025); *see, e.g.*, *Flodin v. Cent. Garden & Pet Co.*, No. 21-CV-01631-JST, 2023 WL 4686016, at *2 (N.D. Cal. July 21, 2023) (dismissing claim because "[w]hile it is possible that avocado represents 'more than 5 percent of the final wholesale value of the manufactured product,'. . . the factual allegations in the [complaint] do not cross the line into plausibility" (citations omitted)).

### D. Plaintiff Does Not Plausibly Allege Her Mattress Falls Outside the Safe Harbor

Because section 17533.7(b)'s safe harbor exempts specific "merchandise . . . if all of the articles, units, or parts of the merchandise obtained from outside the United States constitute not more than 5 percent of the final wholesale value of the manufactured product," CAL. BUS. & PROF. CODE § 17533.7(b), Plaintiff must allege facts regarding foreign components of the specific merchandise at issue. *See also McCoy*, 2025 WL 1918546, at *10 (dismissing the plaintiff's complaint for "fail[ing] to make *any* allegations related to the composition of each Product"). The Court previously concluded that "[b]ecause Plaintiff does not plausibly allege any article, unit, or part of her mattress was obtained from outside the United States, let alone that the value of those articles, units, or parts exceeds five percent of the wholesale value of the mattress she purchased, she fails to plausibly allege it falls outside section 17533.7(b)'s safe harbor." (Dkt. No. 42 at 11.)

Plaintiff has since amended her complaint to add allegations about the composition of

Defendant's mattress. (Dkt. No. 47 ¶¶ 54-69.) In contrast to the previous two versions of her complaint, Plaintiff now plausibly alleges some articles, units, or parts of her mattress were obtained from outside the United States. (*See, e.g., id.* ¶¶ 49, 64-65.) However, these new allegations, even when combined with existing allegations, still do not plausibly support an inference that the value of the articles, units, or parts of Plaintiff's mattress obtained from outside the United States exceeds five percent of the final wholesale value of the mattress.

**1. 2025 Article**

Plaintiff highlights a 2025 article in which Saatva stated "wire, hardware, and specialty fabrics are among the components sources from foreign countries" and alleges Saatva's "did not make [] any material change" to the Saatva Classic mattress's sourcing between the time of Plaintiff's purchase and the 2025 article. (*Id.* ¶ 64-65.) Even assuming the Saatva Classic's supplier network remained fixed between when Plaintiff bought her mattress in November 2023 and the April 2025 article, Plaintiff has not alleged facts plausibly supporting an inference that the *value* of those foreign components is greater than five percent of the mattress's final wholesale value. Plaintiff does not even allege the typical value or amounts of "wire, hardware, and specialty fabrics" used in the average mattress, let alone in the mattress Plaintiff purchased. This article thus fails to support any inference as to the value of the "component sources from foreign countries" in Plaintiff's 2023 mattress.

**2. Mattress Foam Content**

Plaintiff newly alleges mattress foam, which Saatva sources entirely domestically, "constitutes significantly less than half of the Saatva Class mattress by both volume and cost" such that "more than 5% of the mattress is comprised of foreign components." (Dkt. No. 47 ¶ 67.) Even taking Plaintiff's allegation as true on the volume of foam, Plaintiff has alleged no facts connecting the volume of foam with the value of foam. So, this allegation similarly fails to support any inference as to the value of the articles, units, or parts in Plaintiff's 2023 mattress.

**3. Mattress Steel Coils**

Plaintiff newly alleges the 1,300 steel coils in the mattress "represent at least 20% of the

United States District Court
Northern District of California

wholesale value of the Saatva classic" such that "[e]ven if only a portion of the coil steel in Plaintiff's mattress was foreign-sourced, that portion alone is more than sufficient to exceed five percent of the mattress's final wholesale value. (Dkt. No. 47 ¶ 68.) But Plaintiff does not allege any facts to support her conclusory on "information and belief" assertion. *See Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (in deciding a 12(b)(6) motion to dismiss, a court need not accept as true conclusory statements). For example, while Plaintiff plausibly alleges the number of steel coils used in Plaintiff's mattress, she offers no allegations as to what percentage of the coils were imported, the typical wholesale value of a steel coil, nor any other facts that would lend plausibility to its "on [undisclosed] information and belief" conclusion that the coils "represent at least 20% of the wholesale value of the Saatva classic." (Dkt. No. 47 ¶ 68.)

Instead, in her opposition, Plaintiff identifies two factual bases for the allegation. First, Plaintiff argues "descriptions and images show the significance of steel coils to the Saatva Classic." (Dkt. No. 55 at 20.) While the diagrams show there were lots of steel coils in the mattress, they say nothing about the value of those coils. The coils could instead be much like the avocado in *Flodin v. Central Garden & Pet Company*. There, in a suit alleging imported avocado made up a large portion of "Made in the USA" pet food, the court reasoned "[i]t is possible, for example, that the non-avocado ingredients comprise ninety-eight percent of the product's *value* such that avocado comprises only two percent." *Flodin*, 2023 WL 3607278, at *2 (emphasis added). Unable to foreclose that likelihood, "the complaint thus fail[ed] to raise 'more than a sheer possibility' that Defendants violated Section 17533.7." *Id.* (quoting *Ashcroft*, 556 U.S. at 678). Similarly, in *Karpinski v. Handi-Foil Corp.*, No. CV 26-6981-GW-ASx, 2026 WL 2854707 (C.D. Cal. Sept. 22, 2026), the court concluded:

> That Defendants' products are "substantially" composed of foreign aluminum may not matter if, for example, the labor, machining, assembly, packing, overhead, or other various costs associated with manufacturing Defendants' products account for over 96% of the wholesale value of those pans. Absent even a single allegation from the Plaintiff on this issue, the Court is not able to determine whether Plaintiff's have stated a plausible claim for relief.

*Id.* at *7. Put differently, allegations about the volume of an input do not, without more, produce plausible inferences about value of that input. So too here as Plaintiff fails to offer even a "single

allegation" on the contribution of the steel coils to the wholesale value of the mattress, no matter their "significance" in the design of the mattress.

Second, Plaintiff highlights Saatva's blog post in which it stated mattresses that "rely on imported materials like memory foam or steel coils" could be impacted by tariffs and Saatva's "raw materials . . . may be subject to [tariff] price increases." (Dkt. No. 55 at 20 (citing Dkt. No. 47 ¶ 52).) Plaintiff then points to subsequent price hikes as demonstrating the value of imported steel coils. *Id.* 20-21. Even assuming Plaintiff sufficiently alleges Plaintiff's 2023 mattress is identical to the 2025 mattress addressed in the blog post, Plaintiff's allegations do not meet its burden. As a threshold matter, Saatva stated that some of its "raw materials" could be subjected to tariffs. However, "raw materials" do not count toward the value calculation under section 17533.7 since "one would not violate the statute by making, manufacturing, or producing merchandise solely in the United States even though using raw materials acquired from a foreign source." *Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1271 (2007).[2] And, as Plaintiff conceded at oral argument, Saatva's other statements in the blog post refer to the mattress industry generally, not its specific supply chain. (*See* Dkt. No. 47 at ¶ 52.) Nor has Plaintiff alleged how much of the value from steel coils comes from foreign as opposed to domestic suppliers given that "over 85% of" materials other than foam are domestically sourced. (Dkt. No. 47 ¶ 63); *see also Alaei*, 224 F.Supp. 3d at 1000 (dismissing claim where "Plaintiff fails to specify where the allegedly foreign-sourced ingredients were made and what percentage of Defendants' products are comprised of foreign-sourced ingredients"). Thus, Plaintiff's new allegations about the steel coils fail to meet its burden to plausibly allege Defendant sold Plaintiff a mattress exceeding the safe harbor.

**4. Overall Plausibility of Allegations**

Tying its allegations together, Plaintiff alleges "[o]n information and belief, foreign inputs

[2] Plaintiff's argument that "Saatva uses the word 'materials' to refer to manufactured components," (Dkt. No. 55 at 23), is unavailing. Saatva refers to "raw materials," not "materials" in its August 2025 statement, (*see* Dkt. No. 47 ¶ 52), so its usage of the term "materials" elsewhere, (*see, e.g., id.* ¶¶ 45, 49), is not instructive as to what inferences can be plausibly drawn from the blog post. For example, as Plaintiff alleges, some of Saatva's "latex harvested from rubber trees" is "sourced internationally," (*id.* ¶ 50), and thus could constitute some of the "raw materials" referred to in the August 2025 statement.



United States District Court
Northern District of California

are more than 10% of the wholesale value of Defendant's mattress." (Dkt. No. 47 ¶ 70.) Even with the new allegations, Plaintiff's complaint requires, as before, multiple layers of inference, most of which are not plausible. The volume of an input like steel coils or foam in a product, without more, does not plausibly allege value. Plaintiff has not identified the value of *any* of the allegedly imported inputs, whether in Plaintiff's mattress or in the mattress market generally. Even more glaringly, Plaintiff's calculations completely omit the value of labor, transport, and assembly in the wholesale value of the mattress, obscuring the composition of the mattress's wholesale value. Nor has Plaintiff disentangled the value of foreign "articles, units, or parts" in Plaintiff's mattress from that of foreign raw materials falling outside of section 17533.7's applicability. *See Benson*, 152 Cal. App. 4th at 1271. So, even if Saatva used foreign inputs, kept its supply chain fixed between 2023 and 2025, and raised prices in response to tariffs, as Plaintiff alleges, quantifying the value of foreign inputs as greater than five percent of the wholesale value of Plaintiff's mattress is not a plausible inference.

Plaintiff's tariff allegations, (Dkt. No. 47 ¶ 53), do not help satisfy her burden. While, in light of the new allegations, the Court accepts as true that the mattress components in 2025 were the same as when Plaintiff purchased her mattress in 2023 and that Saatva raised the mattress price by over four percent ($80) from April 2025 through February 2026. Even then, Plaintiff's allegations do not plausibly support an inference the price hike was sufficiently due to tariffs to infer that more than five percent of the final wholesale value of Plaintiff's mattress was derived from articles, units, or parts obtained from outside the United States. Plaintiff does not allege if the price hike occurred at once, or gradually during that period. Nor does she allege facts that negate the other factors that commonly explain price increases such that the price increase itself could plausibly support an inference enough of it was due to tariffs to support a further inference that Plaintiff's mattress exceeded the safe harbor. Finally, the only Saatva statement Plaintiff identifies to support an inference the tariffs caused Saatva to increase prices is that Saatva "warned that its mattress prices would increase because of tariffs on *foreign raw materials* used to manufacture the mattresses." (Dkt. No. 47 ¶ 52 (emphasis added).) But, as explained earlier, "one would not violate the statute by making, manufacturing, or producing merchandise solely in the

United States even though using raw materials acquired from a foreign source." *Benson*, 152 Cal. App. 4th at 1271.

Therefore, as Plaintiff does not plausibly allege the value of the articles, units, or parts of her mattress obtained from outside the United States exceeds five percent of the wholesale value of the mattress she purchased, she fails to plausibly allege it falls outside the safe harbor of section 17533.7(b). Furthermore, absent such allegations, Plaintiff cannot allege how Saatva's "Made in the U.S.A." statements were misleading, and her complaint does not satisfy Federal Rule of Civil Procedure 9(b). *See Kearns*, 567 F.3d at 1124 ("Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct." (cleaned up)).

The cases cited by Plaintiff to the contrary did not involve multiple layers of inference, most of which are not plausible, about the percentage of wholesale value comprising imported components. In *Kaufmann v. Nordic Ware, Inc.*, No. 25-cv-1379 (ECT/DLM), 2025 WL 3754252 (D. Minn. Dec. 29, 2025), "the first two steps" of a three-step manufacturing process to make aluminum "happen[ed] outside America" and aluminum was admittedly the "primary" input into the product. *Id.* at *1, 12. Saatva's product, however, involves far more steps and Plaintiff has not even alleged the steps or to what extent those steps occur overseas. Nor has Defendant admitted the primacy of any one component to its product's value. In *Claiborne v. Church & Dwight Co., Inc.*, No.: 3:17-cv-00746-L-JLB, 2017 WL 5256752 (S.D. Cal. Nov. 13, 2017), the court denied a motion to dismiss when the plaintiff alleged "the main ingredient in Condoms is natural latex" and "domestic production of natural latex is minimal and ninety percent of the material comes from Southeast Asia." *Id.* at *2. Putting aside whether steel coils are the "main ingredient" in a mattress like latex is for a condom, Plaintiff, unlike in *Claiborne*, has not alleged anything about domestic production of steel coils nor what percentage of steel coils come from abroad. Put differently, Plaintiff's allegations reveal less about the challenged product and its supply chain than the plaintiffs whose claims have been held plausible.[3]

[3] While *Corona v. It's a New 10, LLC*, No. 25-CV-377-GPC (BLM), 2025 WL 3536117 (S.D. Cal. Dec. 9, 2025) (*Corona II*), did not require any allegations plausibly supporting an inference as

United States District Court
Northern District of California

Plaintiff construes Defendant as "demanding that Plaintiff not just allege but instead prove by a preponderance of the evidence which specific components were manufactured in what country and how much each component contributed to the wholesale value of her mattress." (Dkt. No. 55 at 21.) Plaintiff argues "[t]hat level of detail, precision, and proof [is] not required at the pleading stage." (*Id.*) "However, discovery is not the proper remedy for a deficient complaint based on a plaintiff's mere hope that liability will arise once discovery commences. 9(b)'s particularity requirement is intended to 'prevent the filing of a complaint as a pretext for the discovery of unknown wrongs.'" *Hood*, 2024 WL 4008711, at *3 (quoting *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993)). And, as discussed above, Plaintiff bears the burden of plausibly alleging Plaintiff's mattress exceeded the statutory safe harbor. *See Karpinski*, 2026 WL 2854707, at *3 ("Plaintiff must allege facts demonstrating that Section 17533.7's safe harbor provisions are inapplicable."). Plaintiff has not done so.

The Court therefore GRANTS Saatva's motion to dismiss Plaintiff's CLRA, FAL, and UCL claims. The safe harbor provision is also an additional reason to dismiss Plaintiff's section 17533.7 claim.

## III. COUNT V: BREACH OF CONTRACT

As the Court discussed in its previous order, California law is unsettled as to whether the safe harbor provision also bars common law or breach of contract claims. *Compare Hood*, 2024 WL 4008711, at *1, 3 (dismissing all claims, including "claims for breach of express and implied warranties and unjust enrichment" as barred by section 17533.7), *with Daldalian*, 2025 WL 2778326, at *4-6 (finding the safe harbor barred the plaintiff's UCL, CLRA, and FAL claims but addressing common law fraud, breach of express warranty, and unjust enrichment claims separately). So, the Court previously denied Saatva's motion to dismiss Plaintiff's breach of contract claim as barred by section 17533.7(b)'s safe harbor. (Dkt. No. 42 at 12.) The Court now concludes the safe harbor provision extends to Plaintiff's breach of contract claim.

The safe harbor doctrine "precludes plaintiffs from bringing claims based on 'actions the

---

to value, the Court does not find it persuasive.

Legislature permits.'" *Ebner*, 838 F.3d at 962 (quoting *Cel-Tech*, 20 Cal. 4th at 184). Thus, as one court recently reasoned, "the doctrine's purpose is only well-served if it applies to all such claims [based on actions the legislature permits], not only those under the consumer protection statutes. Finding otherwise would enable plaintiffs to simply circumvent the doctrine entirely by framing consumer protection claims within common law causes of action." *Calgano v. Scotts Co., LLC*, No. 3:25-cv-02661-GPC-DEB, 2026 U.S. Dist. LEXIS 206123, at *29 (S.D. Cal. Sept. 11, 2026). Allowing common law claims arising from statutorily permitted conduct would enable plaintiffs to "plead around a safe harbor" in the manner proscribed by the California Supreme Court. *Cel-Tech*, 20 Cal. 4th at 184. This Court thus follows *Calgano* in applying the safe harbor doctrine to a plaintiff's common law claims "premised on" a permitted activity. *Calgano*, 2026 U.S. Dist. LEXIS 206123, at *29.

Here, Plaintiff's breach of contract claim has the exact same basis as the statutory claims barred by the safe harbor: Saatva's representation that Plaintiff's mattress was "Made in the U.S.A." (Dkt. No. 47 ¶ 129 ("The contracts further required that Defendant provide Plaintiff and the Class with mattresses that were Made in the USA consistent with California and federal law and Defendant's representations on the Website"); *id.* ¶ 132 ("Defendant breached the contracts with Plaintiff and the Class by failing to provide mattresses that were Made in the USA as claimed on the Website.").) Therefore, the safe harbor doctrine applies to Plaintiff's breach of contract claim.

So, Plaintiff's breach of contract claim is subject to the safe harbor provision and, for the same reasons as Plaintiff's CLRA, FAL, and UCL claims, the Court GRANTS Saatva's motion to dismiss.

## IV. LEAVE TO AMEND

"The court should freely give leave [to amend] when justice so requires. Fed. R. Civ. P. 15(a). "Although there is a general rule that parties are allowed to amend their pleadings, it does not extend to cases in which any amendment would be an exercise in futility or where the amended complaint would also be subject to dismissal." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). Plaintiff has now filed three versions of her complaint. (Dkt. Nos. 1,

29, 47.) She filed her first amended complaint, (Dkt. No. 29), after seeing Defendant's motion to dismiss. (Dkt. No. 23.) And before she filed her second amended complaint, she had the benefit of Defendant's second motion to dismiss, 30 minutes of oral argument, and the Court's subsequent written opinion. (Dkt. Nos. 32, 41, 42.) At oral argument on the motion to dismiss the second amended complaint, it became apparent there is nothing more that Plaintiff can allege. She had no knowledge of estimated labor costs, the purported costs of the alleged foreign inputs, or even of what would be factored into the final wholesale value of a mattress. And her opposition does not identify any new facts that could be added if given leave to amend.[4] Amendment would therefore be futile. So, the Court DENIES leave to amend.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Saatva's motion to dismiss Plaintiff's second amended complaint and DENIES leave to amend.

This Order disposes of Docket No. 53.

**IT IS SO ORDERED.**

Dated: October 13, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

[4] The one exception is Plaintiff's suggestion she could add that "[i]f she had seen an accurate label, she would have returned her mattress or asked Saatva for a discount to reflect the fact that the mattress was not 'Made in America.'" (Dkt. No. 55 at 13.) However, as discussed, such an addition would not establish reliance as required under Count I.